660        NEBRASKA REPORTS.        [Vol. 89

Sunderland Bros. Co. v. Chicago, B. & Q. R. Co.

SUNDERLAND BROTHERS COMPANY, APPELLEE, V. CHICAGO, BURLINGTON & QUINCY RAILWAY COMPANY, APPELLANT.

FILED JUNE 26, 1911. No. 16,485.

1. **Carriers:** TRANSPORTATION OF FREIGHT: LIABILITY. The general rule is that a common carrier of goods insures their safe delivery to the consignee against loss or injury from whatever cause arising, except only the act of God or the public enemy.

2. ———: DESTRUCTION OF GOOODS: ACT OF GOD: CONCURRENT NEGLIGENCE. If the carrier needlessly delays the shipment or negligently fails to protect it from known or threatened danger, and the goods are overtaken in transit and are damaged or destroyed by an act of God, and such negligence or unreasonable delay is the proximate or concurring cause of the injury or destruction, the carrier is liable for the loss; and this rule applies whether the goods are perishable or nonperishable in their nature.

3. ———: EXCESSIVE RATES: EVIDENCE. Evidence examined, and *held* insufficient to sustain that part of the judgment which is based on an alleged excessive freight charge.

APPEAL from the district court for Douglas county: HOWARD KENNEDY, JUDGE. *Affirmed on condition.*

*Greene & Breckenridge,* for appellant.

*Baldrige, De Bord & Fradenburg, contra.*

BARNES, J.

The plaintiff commenced an action in the district court for Douglas county against the defendant, a common carrier, to recover damages for negligence and delay in the transportation of 12 car-loads of lime, which plaintiff alleged caused its destruction by the flood of June, 1903, while in the defendant's yards at Kansas City, Missouri. Plaintiff also commenced another action against the defendant to recover the amount of an alleged overcharge or excessive rate charged and collected for the transportation of certain cement from Hannibal, Missouri, to South

Omaha, Nebraska, in June and July, 1906. The actions were consolidated and tried together. The plaintiff had the verdict on both causes of action, and from a judgment on the verdict the defendant has appealed. The appeal is presented as though the record contained two cases, one designated as the flood case and the other as the rate case. We adopt the defendant's classification, and will consider the questions in the order in which they have been pre-sented.

In the flood case, it is contended that the district court erred in refusing to direct the jury to return a verdict for the defendant at the close of all of the evidence. It appears that in May, 1903, the plaintiff purchased of the Western White Lime Company 12 car-loads of lime, put up in barrels and delivered to the purchaser f. o. b. the cars of the Saint Louis & San Francisco Railroad Company, commonly called the "Frisco" line, at Ashgrove, with express instructions from the plaintiff that the same be routed to its destination by way of Kansas City, and over that part of defendant's railroad known as the "K. C." line. Three cars of this lime were delivered to the defendant at its yards in Kansas City, Missouri, on the 26th day of May, 1903, and the remaining nine cars were delivered to and received by the defendant at that place from May 26 to May 30, inclusive; that during the time of such delivery the country drained by the Kaw river and its tributaries was being flooded by heavy rains, which continued from day to day until the 31st day of May, at which time an unprecedented flood of water reached Kansas City, completely flooding the defendant's yards, in which all of the cars of lime were situated, and which resulted in its complete destruction. The trial court instructed the jury that the flood above mentioned was so great, unprecedented and unusual as to amount to an act of God, and that, in order to entitle the plaintiff to recover, it was required to show that some act of negligence on the part of the defendant, which, concurring with the act of God, was the proximate cause of the loss and damage complained of.

It is contended, on the part of the defendant, that it was not guilty of any negligence, and that under the circumstances, as disclosed by the testimony, it was not chargeable with negligence in failing to seasonably forward the lime to its place of destination, and thus escape the flood above described. It appears, however, that as early as May 25 the weather bureau forecaster at Kansas City sent out warnings to the people and the railroad officials of the approach of the flood. This it continued to do from day to day and time to time, and on the 29th day of May the following warning was prepared on postal cards and mailed to all points between St. Joseph and Boonesville, Missouri. "May 30, 1903. Stage of Missouri river at 7 A. M. at Kansas City 25 feet and still rising. This is more serious than the flood of 1892, and only about one foot below the stage of 1881. Heavy rains in Missouri and eastern Kansas last night renders the situation more alarming for points below Kansas City." The transportation companies were also warned that it would be well for all interested to be prepared for emergencies. On May 31 it was stated by the weather forecaster at Kansas City: "No reports of any kind received. Cut off from telegraphic and telephonic communication except to the eastward. Nothing could be said except what was actually happening in this vicinity." Warnings were sent out to the heads of the railroads informing them of the increasing danger as early as May 28, stating that interests affected by high water should be closely guarded. It is admitted that those warnings were received by the officials and employees having supervision and charge of the traffic of the defendant's road at Kansas City. Notwithstanding such warnings and the daily newspaper reports of the magnitude of the approaching floods, the defendant took no steps to remove the cars containing the lime in question to higher ground, and failed and neglected to forward them to their place of destination, or in any manner remove them from flood danger. It appears that the traffic between Kansas City and Omaha by way of the Kansas City line was interrupted

for some of the time in question by washouts at or near St. Joseph, but it also appears that the defendant forwarded freight amounting to some 30 or 35 cars a day of what it called perishable goods from Kansas City to Omaha, and that it could have routed the lime in question by way of Chariton, Iowa, to its place of destination. Again, it is well known that by exposure to floods white lime is of a most perishable nature.

From the foregoing it appears that this case is fairly within the rule announced in *Wabash R. Co. v. Sharpe*, 76 Neb. 424, where the facts were practically the same as those in the case at bar. It there appeared that one Sharpe delivered to the railway company at La Fayette, Indiana, some household goods for shipment to Lincoln, Nebraska. The goods were shipped from La Fayette on the 21st day of May, 1903, and were delivered to the Missouri Pacific Railway company, the connecting carrier at Kansas City, on the 26th day of May, which was the same day that the first three cars of the lime in question herein were delivered to the defendant. The household goods were held in the yards by the Missouri Pacific Railway Company until May 31, when they were injured by the same flood that destroyed the plaintiff's lime. Action was brought to recover the value of the goods; the plaintiff had judgment, and on appeal to this court it was said: "It is claimed by the railroad company that they shipped the goods within a reasonable time, and delivered them to the connecting carrier at Kansas City in good condition. This may all be true, and still it is no answer to the plaintiff's claims. The common carrier of goods insures their safe delivery to the consignee against loss or injury from whatever cause arising, excepting only the act of God and the public enemy. The delivery of the goods to the carrier in good order, and their arrival at the place of destination in bad order, makes a *prima facie* case against the carrier. It then devolves upon it to show that the loss or damage was caused by the act of God or some other cause which would exempt it from liability. It may be conceded in

the present case that the flood by which the goods were
practically destroyed was an act of God, which, under or-
dinary circumstances, would relieve the company; but we
think the rule supported by the weight of authority is that
a common carrier is responsible for injury to goods by act
of God, if he departs from his line of duty, and while thus
at fault, and in consequence of that fault, the goods are
injured by an act of God which would not otherwise have
produced the injury. Or, as stated in one of the cases, a
common carrier is responsible for injury to goods by the
act of God where the goods were exposed to injury by
the carrier's inexcusable detention." In the instant case
it would seem, in the absence of any reasonable showing
to the contrary, that the delay of five days or more in the
yards at Kansas City was an unreasonable delay in the
transportation of the plaintiff's lime, and, when we con-
sider the evidence that the officer in charge of the weather
bureau at Kansas City from May 25 to May 31 daily and
frequently notified the public and the railroad companies
of the coming flood, of the constant and increasing rains
throughout the territory drained by the Kaw river, upon
the banks of which the defendant's yards at Kansas City
are situated, there would seem to be no doubt of the
negligence of the defendant in not removing the plaintiff's
lime to higher ground as a place of safety, or in failing to
forward the cars to Omaha, although it became necessary
to do so over a different road than the one by which they
were billed. It may be said, in view of the repeated warn-
ings of approaching danger, that, if the defendant was
unable to immediately forward the lime to its destination,
it should have notified the "Frisco" line of that fact, and
refused to receive it, which was the course pursued at that
time by the other railroads centering in Kansas City, as
shown by the testimony of the defendant's witnesses.

It appears that the flood of May, 1903, at Kansas City,
Missouri, has resulted in a great many actions against
the different railroad companies transacting business in
that city; and it appears without exception that the courts

of last resort of the several states where such actions have been brought have held the transportion companies liable for its consequences. In *Pinkerton v. Missouri P. R. Co.,* 93 S. W. 849 (117 Mo. App. 288) the court said: "A carrier is liable for loss of freight from a flood, if it was aware of its approach in time to remove the goods to a place of safety by the exercise of ordinary care and diligence." It was held that the evidence in that case was sufficient to go to the jury on the question of the defendant's negligence in not taking the goods to a place of safety after it knew of the approach of the flood. To the same effect is *Bibb Broom Corn Co. v. Atchison, T. & S. F. R. Co.,* 94 Minn. 269. In that case it was said: "It is the duty of a common carrier to whom goods are delivered for transportation promptly and without unreasonable delay to forward them to their destination and such was defendant's duty in the case at bar. This it failed to do, and its negligence in this respect is not seriously controverted. The car arrived at its yards in Kansas City on May 23, and was permitted to remain there without proper effort to forward it until it was overtaken by the flood. It could have been moved from the defendant's yards on any day after its arrival prior to May 29, and, had this been done, the corn would not have been damaged. If the defendant had acted as required by the terms of its contract, and as enjoined by law, the car would have been forwarded, and would have arrived at its destination prior to the flood. That defendant's neglect concurred and mingled with the act of God seems the only reasonable conclusion the facts will warrant, and we feel safe in applying the general rule that an act of God is not in such cases a defense." See, also, *Green-Wheeler Shoe Co. v. Chicago, R. I. & P. R. Co.,* 130 Ia. 123, which is another of the flood cases. We are therefore of opinion that the court properly refused to direct a verdict for the defendant.

Complaint is made of the court's fourth instruction, but, in view of the foregoing, this complaint is not well founded. We find no error in the record which affects the

verdict and judgment in what is called the flood case, and to that extent the judgment of the district court should be affirmed.

It appears that the so-called rate case was brought to recover the sum of $245.10, an alleged overcharge for the transportation of 13 cars of cement from Hannibal, Missouri, to South Omaha, Nebraska, in June and July, 1906. It was stated in the petition, in substance, that the cement was sold to and used by the Union Stock-Yards Company at South Omaha; that the published tariff of the defendant prescribed a rate of $7\frac{1}{2}$ cents per hundred weight on cement in car-load lots where such cement is used for steam railroads, but that, disregarding this tariff, the defendant required the plaintiff to pay at the rate of 10 cents per hundred pounds for the transportation of this cement, and judgment was prayed for the amount of the alleged overcharge. The answer contains a general denial.

At the trial it was admitted that the published tariff (exhibit 14), as shown by the record, was in force at the time of the transaction complained of, and that the $7\frac{1}{2}$-cent rate was limited to railway material and supplies for steam railroads only for their own use. The tariff sheet is unambiguous in its terms, and provides a rate for west-bound railway material and supplies (except powder and high explosives, rails and fastenings) for steam railroads only C. L. $7\frac{1}{2}$ cents, while the rate to others is fixed therein at 10 cents per hundred pounds. Upon the introduction of the evidence, it appears that the plaintiff was at the times mentioned a corporation existing under the laws of this state, engaged in commerce, and, among other things, in the purchase and sale of lime, cement, coal, and similar commodities, and had its principal place of business in Omaha, Nebraska. Mr. Sunderland testified that his company bought the cement and sold it to the stock-yards company. He further testified that the cement was bought by the company for its own commercial purposes, and that it was bought for resale. No claim is made that the tariff was discriminatory, and plaintiff seems to rely wholly on

the facts which it insists brings the transaction within the 7½-cent rate; while the defendant contends that it clearly falls within the 10-cent rate, and to that end requested the district court to instruct the jury to return a verdict in its favor. This request was denied, and the jury were instructed to return a verdict for the plaintiff. Obeying this instruction, a verdict was returned against the defendant for the sum of $323.30, which amount was included in the judgment complained of by the defendant.

It is contended that the court erred in refusing to give the instruction requested by the defendant, and to our minds this contention is well founded. It seems clear from even a casual reading of the tariff that the 7½-cent rate was limited exclusively to railway material and supplies for steam railroads only and for their own use; that the plaintiff purchased the cement in question for the purpose of resale, not to steam railways only, but to any one who might have use for that sort of material. By the terms of the tariff the defendant was entitled to charge and receive for transporting it 10 cents per hundred pounds. This rate was fixed and certain, and the company was entitled to know that such would be the compensation for its services. We are therefore of opinion that the plaintiff was not entitled to demand the lesser rate, which applied only to material billed to steam railways for their own exclusive use. It must be observed that this cement was shipped at the 10-cent rate, and the plaintiff does not contend that there was any express contract or arrangement with the defendant that the 7½-cent rate was to apply to this shipment. It simply makes this claim under its construction of the meaning of the tariff.

We think that neither the language of the tariff nor the facts warrant such a construction. It is urged that the Union Stock-Yards Company is a steam railway within the meaning of the tariff, and therefore plaintiff was entitled to the 7½-cent rate; but this contention is beside the mark, for, until the cement was actually received by the stock yards company, plaintiff could have diverted the

shipment and required its delivery to any other customer. On the other hand, it is contended by the defendant that, even if the Union Stock-Yards Company is to be considered a steam railway, still, as a matter of fact, the cement was not used for the purpose of railway construction. As we view the situation, it is unnecessary to consider these questions. We are of opinion that the defendant was entitled to receive and collect from the plaintiff the usual 10-cent rate for this shipment, and that the district court erred in refusing to direct a verdict in its favor upon this cause of action.

It follows that so much of the judgment of the district court as represents the recovery in the rate case should be reversed, and that cause of action should be dismissed; but, as to the so-called flood case, the judgment of the district court should be affirmed. The plaintiff is therefore allowed to file a remittitur with the clerk of this court for the sum of $323.30 within 40 days, and, upon the filing of such remittitur, the judgment of the district court will stand affirmed; but, upon the failure to do so, the judgment of the district court will be reversed and the cause remanded for further proceedings.

JUDGMENT ACCORDINGLY.

SEDGWICK, J., took no part in the decision.